Duane **KEELER**, et al., Plaintiffs, Appellants,

v.

David **HEWITT**, et al., Defendants, Appellees.

No. 81–1635.

United States Court of Appeals, First Circuit.

Argued Nov. 1, 1982.

Decided Dec. 30, 1982.

Warren C. Nighswander, Concord, N.H., with whom Sulloway Hollis & Soden, Concord, N.H., was on brief, for plaintiffs, appellants.

Paul Barbadoro, Asst. Atty. Gen., Quincy, Mass., with whom Gregory H. Smith, Atty. Gen., Concord, N.H., and Eve H. Oyer, Contoocook, N.H., were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, BROWN,[*] Senior Circuit Judge, and CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

This action brought under 42 U.S.C. § 1983 in the United States District Court for the District of New Hampshire grew out of a series of escalating confrontations between defendant/appellee Hewitt and plaintiffs/appellants, the Keelers. Over the weekend of July 14–15, 1979, Jeffrey Keeler and Donna Lewis, now Jeffrey's wife, were staying with his parents, Duane and Norma, at their vacation home on Bear Island in Lake Winnipesaukee. At around 7:00 p.m. that Saturday, Jeffrey and Donna set out in a small boat to fish. Officer Hewitt approached in his boat and asked to see their fishing licenses.[1] Donna did not have a license, and Jeffrey's was back on shore. After a rather testy discussion—during which, according to Hewitt, Jeffrey and Donna rudely questioned his right to stop them, and, according to Jeffrey and Donna, Hewitt repeatedly rammed into their smaller boat—Jeffrey reluctantly agreed to retrieve his license. Once ashore, Donna went into the house and did not return;

---

[*] Of the Sixth Circuit, sitting by designation.

1. There is some dispute as to whether both Jeffrey and Donna were fishing. Hewitt testified that he believed Donna had a line in the water; the Keelers testified that only Jeffrey was fishing, or ever fished. Donna was later acquitted of the charge of fishing without a license.

Jeffrey brought Hewitt his license. The essentials of what followed are clear enough: Hewitt took down the information on the license, was unable to discover who Donna was, was thwarted in an effort to seize the poles as evidence when people assembled at the camp grabbed them first, and left in a huff. The details of this scenario vary wildly with who is telling the story. Suffice it to say that angry words were exchanged.

On leaving the island, Hewitt went to the Department of Safety Building and drafted complaints, affidavits, and arrest warrants for Jeffrey and Donna (whom he identified only as "Jane Doe"). The arrest warrants were issued by a local justice of the peace and Hewitt, defendant Lyon, and other officers set off then and there to execute them. They arrived at midnight to a darkened house. Duane, Norma, and Donna were at home. Everyone agrees that Hewitt and Lyon[2] entered the house without being let in, but the exact circumstances of the entry are in dispute. Hewitt and Lyon testified that they saw someone "bolt" near the door as they approached, that the door was partly open and Hewitt heard whispering behind it, and that they knocked and called out several times without obtaining a response. The Keelers assert that they were asleep with the door closed and were first awakened by the officers' voices and flashlights in the house. There followed a confused and hostile confrontation, with Donna hiding in a corner, Norma distraught and cowering in bed, and Duane waving a gun, ordering the officers to leave, and shoving them toward the door. Calm was restored a bit when Hewitt went outside, leaving Lyon and Duane to discuss matters. Lyon took down Donna's name and a false address (Duane asserts that the address was given in exasperated jest after he had told Lyon several times that he did not know where Donna lived) and left without attempting to arrest anyone. Jeffrey re-

turned later that night to find his family distraught.

The following Monday, Hewitt and other officers appeared at Jeffrey's office with a warrant for his arrest. Jeffrey, however, was not there. According to Jeffrey, Hewitt then failed to keep an appointment they had scheduled for later that night. Hewitt claims they had not agreed to meet. On Tuesday, Jeffrey and Donna were served with summonses on charges growing out of the weekend's events. In actions brought and prosecuted by Hewitt himself, Donna was acquitted of fishing without a license, and Jeffrey was acquitted of interference with a conservation officer and disobeying a conservation officer, but convicted of fishing without a license on his person and fined $50.

The Keelers then brought this section 1983 damages action against Lyon and Hewitt, claiming violations of their rights under the fourth and fourteenth amendments. In the complaint, plaintiffs alleged unlawful arrest, deprivation of the right to be secure against a warrantless, forceable entry, invasion of privacy, and public embarrassment. Nowhere, however, did they mention malicious prosecution as a basis for recovery. The complaint was later amended to include a claim for an alleged unconstitutional detention of Jeffrey's person, and then again to seek an injunction against the head of the New Hampshire Fish and Game Department, Charles Barry. By agreement of all the parties, consideration of the claim against Barry was postponed until after jury trial of the claims against Hewitt and Lyon.

The jury found for the defendants. The district court entered judgment accordingly, and rejected the amendment adding Barry as a defendant as "moot" in light of the verdict. Plaintiffs' motion for a new trial was denied, and they appeal.

---

**2.** Hewitt and Lyon state that two other officers went to the island but did not enter the house. The Keelers insist that a person in plain clothes came into the house with Hewitt and Lyon, but they have been unable to discover who this person was.

## A. *Alleged Unlawful Entry*[3]

■ Appellants assert that the jury's verdict was against the clear weight of the evidence and requires the grant of a new trial. We will reverse a denial of a motion for new trial because the jury's verdict was against the weight of the evidence only if the district judge committed an abuse of discretion. *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.1982). The jury verdict is to stand unless "seriously erroneous." 6A *Moore's Federal Practice* ¶ 59.-08[5], at 59–160. This standard is strict. Mere disagreement with the verdict will not justify the granting of a new trial. *Coffran,* 683 F.2d at 6; *Borras v. Sea-Land Service, Inc.,* 586 F.2d 881, 887 (1st Cir. 1978).[4] Under these standards, we cannot say that the judge abused his discretion here.

Before examining the jury's verdict, we turn briefly to the legal standards as stated in the court's instructions. The district court determined that *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)—a case decided before trial but almost two years after the events in question—should not be applied retrospectively. Accordingly, the jury was told to find for the plaintiffs unless 1) Hewitt and Lyon had probable cause to believe Jeffrey and Donna would be in the house; 2) the entry itself was reasonable in light of all the surrounding circumstances; and 3) Hewitt and Lyon reasonably believed that those conditions were met. It is not now contended the instructions were erroneous.[5] In assessing the jury's verdict, therefore, we assume without deciding the correctness of these instructions.

■ Appellants first argue that even reading the evidence in the light most favorable to defendants, the officers lacked probable cause to believe that Jeffrey and Donna would be found in the house. Defendants' "knowledge and trustworthy information" was not, they say, sufficient to cause "a man of reasonable caution" so to believe. *See Vasquez v. Snow,* 616 F.2d 217, 220 (5th Cir.1980). Appellants point out that Hewitt's information was especially weak with regard to Donna, who was identified only as "Jane Doe" and whose relationship with Jeffrey had not been established at the time of the entry.

However, the jury was entitled to sustain the entry if there was probable cause to believe Jeffrey was in the house; and we think the evidence was adequate to support a finding of probable cause in that respect. Hewitt testified,

> Jeffrey had told me in the boat that the licenses were back at *his* camp. I followed him directly to the camp. He knew the people at the camp and he went apparently into the camp and returned a minute later with his license and his wallet.

(Emphasis supplied.)

Hewitt also testified that Jeffrey had pointed back to the shore on the east side of Bear Island as the location of his camp. From this and other evidence, a man of reasonable caution could infer that Jeffrey was staying at the camp and, it being a Saturday, would probably still be there that evening. Testimony that the people who greeted Jeffrey at the camp bore a family resemblance and closely identified with his cause also suggested that Jeffrey was part of a family group staying at the camp.

Appellants next assert that the entry into the home violated the fourth amendment's reasonableness requirements. We agree

---

**3.** Only Duane and Norma press this claim on appeal in light of the acknowledged tenuousness of Donna's standing, as a mere guest, to challenge the lawfulness of the entry. Jeffrey, who returned home after the defendants had left, never claimed that the entry violated his constitutional rights.

**4.** In denying the motion, the district judge stated, "The court does concede that if the plaintiffs had waived jury, it would have found for the plaintiffs Duane Keeler, Norma Keeler and Donna Keeler. It is not the prerogative of the court to usurp the function of the jury under these circumstances."

**5.** Plaintiffs had sought an instruction under the *Steagald* standard but also submitted, as an alternative, an instruction essentially identical to that given.

that appellants had a very strong case, and can understand the court's statement that it would have found differently from the jury. However, the "reasonableness" of the defendants' conduct was a question of fact for the jury to determine from the totality of a number of specific and, in many instances, disputed facts. The jury was entitled to have accepted Hewitt's version of the entry and the events leading up to it. That picture was one of a conscientious and respectful officer, doing his duty, stymied at every turn by uncooperative and abusive scofflaws. Hewitt indicated that he was threatened, thwarted, and abused at the beach. Disagreement as to the circumstances of the entry itself was also severe. The jury could have accepted Hewitt's version, according to which the officers' conduct was not per se unreasonable.

Finally, appellants assert jury confusion as a reason for allowing a new trial on the unlawful entry claim. As evidence of actual confusion, appellants point to questions submitted by the jury asking about malice and the facts surrounding Hewitt's appearance at Jeffrey's office the following Monday, and to its request that the entire charge be reread. But we cannot say these questions indicate that the jury was confused. It was entitled to think and, in the process, ask questions. We do not see how the question "How does malice enter? What degree?" necessarily indicates that the jury was confused or considering claims not before it; the judge had instructed the jury on maliciousness with regard to possible punitive damages.

The cases relied on by appellants are inapposite. In *Wood v. Holiday Inns, Inc.*, 508 F.2d 167 (4th Cir.1975), the court granted a new trial because the verdict itself indicated confusion. In *Barnett v. Love*, 294 F.2d 585 (4th Cir.1961), an internally inconsistent verdict was coupled with misleading statements by the trial judge in response to the jury's questions. Neither circumstance is present here. Rather, appellants' argument is essentially based on their conviction that the jury reached a mistaken result.

Appellants point out that the jury was handed a verdict blank for "Jeffrey Keeler v. David Hewitt" even though, ultimately, no claims of Jeffrey's were put to the jury. We are also told the court inadvertently instructed on Jeffrey's unlawful detention claim, as to which it had earlier directed a verdict. But the judge caught and corrected his instructional error. These incidents could at most have caused consideration of claims by Jeffrey when none were before the jury. We do not see that they would have caused the jury to commit error with regard to the claims properly before it.

This was not a complex, highly technical, drawn-out trial containing issues beyond the ken of lay people. *Compare Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90–91 (3d Cir.) (en banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). It involved a classically human drama of the type which jurors can understand as well as those trained in the law. The plaintiffs had full opportunity to put their case before their peers. We think the court properly declined to order a second trial.

### B. *Malicious Prosecution*

Appellants also seek a new trial on the ground that the judge committed prejudicial error by refusing to grant a requested instruction to the following effect: that if the jury found that Hewitt had acted with malice and without probable cause in bringing and prosecuting the charges, and that these acts deprived plaintiffs of their liberty without due process of law, then they must find Hewitt liable to Jeffrey and Donna "for damages resulting from such malicious prosecution."

This so-called "malicious prosecution" instruction was in fact a distinct theory of liability under section 1983 (it did not provide for a finding of malicious prosecution under state law). The instruction was to be in addition to those actually given allowing for liability of the defendants to the Keeler parents on fourth amendment grounds by reason of the warrantless entry into their house. Appellants argue that the facts set out in their complaint, and the various alle-

gations of lack of probable cause to arrest, malice, bad faith, and violation of due process, were sufficient to compel such an instruction even though nowhere in the complaint were the words "malicious prosecution" used nor were there allegations that by *prosecuting* Jeffrey and Donna (as distinct from detaining them and entering the parents' house) the defendants had violated the plaintiffs' constitutional rights.

We think the court acted well within its discretion in refusing to give the instruction. There are really three questions. First, was the malicious prosecution claim raised by the pleadings, i.e., was it sufficiently clear from the pleadings that Jeffrey and Donna were asserting a constitutional violation premised on the theory of malicious prosecution so that defendants would or should have understood this and were thus put on notice of the need to prepare a defense. Second, if the claim was not evident in the pleadings, was it nonetheless tried by the express or implied consent of the parties, so as to require its submission to the jury. Fed.R.Civ.P. 15(b). Third, did justice require the court to allow the pleadings to be, in effect, amended at the trial so as to include the "malicious prosecution" theory. *Id.*

On the first point, we see nothing in the complaint to indicate that Jeffrey and Donna were claiming damages on a malicious prosecution theory. Nowhere was such a claim specified, although the plaintiffs took great pains to spell out other claims and offered an amendment for their claim of unlawful detention on the beach. Malicious prosecution was by no means an obvious claim on these facts—Jeffrey had been convicted of fishing without a license, and Hewitt, as prosecutor, may have had absolute immunity. *See also Landrigan v. City of Warwick,* 628 F.2d 736, 745–46 (1st Cir. 1980) (status of malicious prosecution under section 1983 is uncertain). Neither plaintiffs' pretrial statement nor the magistrate's pretrial order mentions any such theory.[6] The court, therefore, committed no error in construing the complaint as not raising the theory.

If the malicious prosecution issue were tried with the express or implied consent of the parties, however, it should have been "treated in all respects as if [it] had been raised in the pleadings," regardless of whether the pleadings were actually amended. Fed.R.Civ.P. 15(b). No consent, express or implied, was given here. Defendants repeatedly objected to the proposed instruction. They also objected when plaintiffs sought to introduce evidence specifically relating to the prosecution. It is true that some general testimony was given, apparently without objection, that might also have gone to a malicious prosecution claim. Several witnesses described not only the weekend confrontation but the events of the following days, the issuance of summonses to Jeffrey and Donna, and the outcome of their prosecution. However, such general narrative descriptions of the entire sequence of events was also relevant to the overall reasonableness of the defendants' behavior, their good faith, and the nature of the conflict between the parties. Failure to object to this evidence cannot therefore be taken as implied consent to trial of the malicious prosecution claim. *See Vargas v. McNamara,* 608 F.2d 15, 18 n. 3 (1st Cir.1979) (introduction without objection of evidence on negligence issue that also bore on unseaworthiness issue did not constitute consent to try the latter); *Jakobsen v. Massachusetts Port Authority,* 520 F.2d 810, 813 (1st Cir.1975).

---

**6.** The order describes plaintiffs' theory of liability as the denial "of constitutional rights to be free from unreasonable search and seizure, from arrest, and detention with warrant having been properly issued and based on probable cause."

On the eve of trial, plaintiffs did seek to amend their pretrial statement to include a claim for damages from the allegedly unfounded prosecution. Defendants strongly objected. The court allowed the statement to be amended, but declined to rule on the defendants' objection until an attempt to introduce the relevant evidence was made at trial. Although some such evidence was introduced, at the end of trial the court remained undecided whether it would give a malicious prosecution instruction. We construe its refusal to do so as a final determination against allowing this theory to be advanced.

A final question is whether the court erred in not allowing plaintiffs, in effect, to amend their pleadings so as to include the malicious prosecution claim. Even where, as here, objection is made, "the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits." Fed.R.Civ.P. 15(b).

This was not a situation, however, where the court was required to allow an amendment. Rather the court could properly have believed that defendants would have been prejudiced by the last-minute addition of the malicious prosecution claim. Discovery had been in progress for two years on all aspects of the case. Had defendants been timely alerted to the claim, they would have been able to seek discovery relative to the prosecution, engage in appropriate legal research, and perhaps offer evidence and authority tending to rebut the claim. *See generally Gonzales v. United States,* 589 F.2d 465 (9th Cir.1979). No satisfactory reason appears for not having identified this issue before trial.

The decision whether to allow amendment is within the discretion of the trial judge and will be reversed only where that discretion has been abused. *E.g., Ellis v. Arkansas Louisiana Gas Co.,* 609 F.2d 436, 439 (10th Cir.1979), *cert. denied,* 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 239 (1980); 6 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 1493 (1971). In this case the malicious prosecution issue was tried, if at all, without notice to the defendants and without their consent, and defendants would have been prejudiced by an eleventh hour amendment. *See Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1086 (2d Cir.1977). The district judge did not abuse his discretion in refusing to put the matter before the jury.

### C. *Claim Against Defendant Barry*

Less than a week before trial, a different judge granted plaintiffs leave to amend their complaint to add Charles Barry as a defendant. The amended complaint sought an order requiring Barry to promulgate rules and regulations governing procedures for searches and arrests by conservation officers. After the jury returned its verdict, the trial judge issued an order referring to the motion for leave to amend and stating "[i]n view of the jury's verdict, the court considers this request moot."

Whether or not the defect was truly one of "mootness," we affirm the dismissal. Put simply, plaintiffs wanted the court to order Barry to order his subordinates to obey the law. As support for such an order, they asserted that the other defendants had acted unlawfully toward them. The jury's verdict amounted to a finding that defendants had not done so. It thus eliminated any possibility of equitable relief against Barry based on the conduct of Barry's subordinates that was the subject of this action.

*Affirmed.*